UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SULLIVAN

-------------------------------------------------------x

CELLYNNE CORPORATION and
CELLYNNE HOLDINGS, INC.

    Plaintiffs.

        -v-

EXPORT-IMPORT BANK OF THE
UNITED STATES, ASIA PULP & PAPER CO.,
LTD., PT PINDO DELI PULP AND PAPER
MILLS, and SOLARIS PAPER, INC.

    Defendants.

-------------------------------------------------------x



08 CIV 11118

**COMPLAINT FOR
INTERPLEADER**

## COMPLAINT FOR INTERPLEADER

Plaintiffs Cellynne Corporation and Cellynne Holdings, Inc. file this Complaint for Interpleader pursuant to Rule 22 of the Federal Rules of Civil Procedure and 28. U.S.C. § 1335, and state:

### Jurisdiction and Venue

1.    This is a complaint for statutory interpleader in the amount of $1,898,301.86.

2.    This court has jurisdiction over this interpleader pursuant to 28 U.S.C. § 1335 because this case involves money of $500 or more, there are two or more adverse claimants of diverse citizenship who may claim to be entitled to such money or to any one or more of the benefits thereof and also because the United States of America is a party defendant.

3.    Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1397.

## Parties

4.      Plaintiff Cellynne Corporation is a Florida corporation with its principal place of business in Haines City, Florida.

5.      Plaintiff Cellynne Holdings, Inc. is a Florida corporation with its principal place of business in Haines City, Florida.

6.      Defendant Export-Import Bank of The United States ("Ex-Im") is an agency of the United States of America.

7.      Defendant Asia Pulp & Paper Co., Ltd. ("APP") is a Singapore corporation with its principal place of business in the Republic of Indonesia.

8.      Defendant P.T. Pindo Deli Pulp and Paper Mills ("PT Pindo") is also a Singapore corporation, with its principal place of business in the Republic of Indonesia.  PT Pindo is a subsidiary of Asia Pulp & Paper Company ("APP").

9.      Defendant Solaris Paper, Inc. is a Delaware corporation with its primary place of business in Santa Fe Springs, California.  Solaris Paper, Inc. is the North American subsidiary of APP.

## Facts

10.     This is an action that involves a determination of legal entitlement to the amount of $1,898,301.86 arising from the Court's Writ of Garnishment served to Cellynne Holdings, arising out of Cellynne Corporation's purchases of paper products and goods from defendants APP, PT Pindo and/or defendant Solaris Paper, Inc.

## The Underlying Lawsuit

11.     On October 29, 2003, defendant Ex-Im filed Civil Action No. 03-CIV 08554

(DCP)(JCF) in the Southern District of New York against defendant APP and three of its subsidiaries, including defendant PT Pindo, under the Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. §§ 3001-3008.

12.     The lawsuit claimed that APP and its subsidiaries, including PT Pindo, were beneficiaries of Ex-Im loans and loan guarantees, and that APP defaulted on the loans that Ex-Im made or guaranteed.

13.     Ex-Im moved for summary judgment against APP in the amount of $107,640,070.92, plus interest and costs, and against APP's subsidiaries in the amount of $104,344,903.60, plus interest and costs.

14.     On February 6, 2008, this Court granted summary judgment in Ex-Im's favor, and entered a judgment against APP and its subsidiaries. A copy of the Opinion is attached hereto as Exhibit 1.

15.     The Court entered final judgment against PT Pindo on May 29, 2008, in the amount of $5,288,844.60 plus interests and costs. A copy of the Judgment is attached hereto as Exhibit 2.

16.     On December 4, 2008, the Court served a Writ of Garnishment upon Cellynne Holdings, Inc. against the property of defendant PT Pindo. A copy of the Writ is attached hereto as Exhibit 3.

17.     The Writ requires Cellynne Holdings, Inc. to withhold and retain any property in which PT Pindo has a substantial nonexempt interest and for which Cellynne Holdings has or may become indebted to PT Pindo pending final notice.

18.     Upon information and belief, the Court served the wrong entity. Cellynne

3

Holdings, Inc. does not do business with APP or its subsidiaries.

19.     Rather, Cellynne Corporation places orders for paper products from defendant APP, and receives shipments of those products from defendant PT Pindo.

20.     Cellynne Corporation receives all invoices from, and makes payment to defendant Solaris Paper, Inc., APP's North American subsidiary, for its paper purchases from APP and PT Pindo.

21.     Cellynne Corporation and Cellynne Holdings, Inc. are separate and distinct legal entities.

22.     Because Solaris Paper and PT Pindo are separate subsidiaries of APP, it is unclear to Cellynne Corporation whether it is in possession of any funds owed to APP or PT Pindo (rather than Solaris Paper, Inc.).

23.     Accordingly, Cellynne Corporation is unable to determine who the rightful beneficiary and owners of this $1,898,301.86 is, and cannot resolve the validity of the potential competing claims of the defendants.

24.     Cellynne Corporation and Cellynne Holdings, Inc. have retained the undersigned to provide legal services to them in connection with this Complaint for Interpleader and have agreed to pay a reasonable fee for those legal services.

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)     Determine who is rightfully and legally entitled to the $1,898,301.86 from Cellynne Corporation;

(2)     Determine that Plaintiff Cellynne Holdings, Inc. is not a customer of either APP, PT Pindo or Solaris Paper, Inc. and is therefore not liable to any defendant for any

4

sums of money, and enter an Order discharging Cellynne Holdings, Inc. with prejudice from any and all liability to any of the Defendants with regard to the $1,898,301.86 and the determinations to be made as to which of the Defendants is legally entitled to it;

(3) Permit Plaintiff Cellynne Corporation, by and through wire transfer from Plaintiffs' Counsel Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. to deposit the $1,898,301.86 into the Court's registry;

(4) Upon deposit of the $1,898,301.86 into the Court's registry, enter an Order discharging Plaintiff Cellynne Corporation with prejudice from any and all liability to any of the Defendants with regard to the $1,898,301.86 and the determinations to be made as to which of the Defendants is legally entitled to it;

(5) Award Plaintiffs their costs and reasonable attorneys' fees incurred in bringing this action;

(6) Grant such other and further relief as this Court deems just and proper.

Dated this 22nd day of December, 2008.

Respectfully Submitted,

CONSTANTINE CANNON, LLP
*Local Counsel for Plaintiffs*
450 Lexington Avenue, Fl 17
New York, New York  10017
Telephone No.:  (212) 350-2700
Facsimile No.:  (212) 350-2701

By: _____
ROBERT L. BEGLEITER (RB-7052)
rbegleiter@constantinecannon.com
ADAM NYHAN (AN-3712)
anyhan@constantinecannon.com

*Of Counsel:*

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A
Museum Tower
150 W. Flagler Street, Suite 2200
Miami, Florida 33130
Telephone No.: (305) 789-3200
Facsimile No.: (305) 789-3395

ANA T. BARNETT
Florida Bar No. 217212
abarnett@swmwas.com
KELLY R. MELCHIONDO
Florida Bar No. 0582603
kmelchiondo@swmwas.com

6

# EXHIBIT 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/6/08

```
------------------------------------x
                                    :
EXPORT-IMPORT BANK OF THE           :
UNITED STATES,                      :
                                    :
            Plaintiff,              :
                                    :
        -against-                   :       Civil Action No. 03-8554
                                    :       (DCP)
ASIA PULP & PAPER CO., LTD.,        :
PT INDAH KIAT PULP & PAPER TBK,     :
PT PABRIK KERTAS TJIWI KIMIA TBK,   :
AND PT PINDO DELI PULP AND PAPER    :
MILLS,                              :
            Defendants.             :
                                    :
------------------------------------x
```

[Plaintiff's motion for summary judgment granted.]

Dated: February 6, 2008

Michael J. Garcia, United States Attorney for the Southern
District of New York, Sarah E. Light, Assistant United States
Attorney, Nicole Gueron, Assistant United States Attorney, for
Export-Import Bank of the United States, Plaintiff.

Schnader Harrison Segal & Lewis LLP (Kenneth R. Puhala, Benjamin
P. Deutsch, Matthew S. Tamasco, Erin Cowan) for PT Indah Kiat
Pulp and Paper TBK, PT Pabrik Kertas Tjiwi Kimia TBK, PT Pindo
Deli Pulp and Paper Mills, and Asia Pulp & Paper Co., Ltd.,
Defendants.

## OPINION

POGUE, Judge[1]: This case is about loans guaranteed by the Export-

Import Bank of the United States ("Ex-Im"), for defendant

subsidiaries of the Asian Pulp and Paper company ("APP"), PT

Pabrik Kertas Tjiwi Kimia Tbk ("Tjiwi Kimia"), PT Pindo Deli Pulp

---

[1]Judge Donald C. Pogue of the United States Court of
International Trade, sitting by designation.

& Paper Mills ("Pindo Deli"), and PT Indah Kiat Pulp and Paper
("Indah Kiat"), known collectively in this proceeding as the
"Principal Indonesian Operating Companies" ("PIOCs").

Ex-Im is a government agency charged with increasing exports
from the United States by providing loans and loan guarantees to
would-be importers of products produced in the United States. APP
is an Indonesian company and one of the largest paper producers
in the world. As explained more fully below, APP and its
subsidiaries were beneficiaries of  Ex-Im loans and loan
guarantees.

Claiming that Defendants have defaulted on the loans that
the Ex-Im made or guaranteed, Plaintiff moves for summary
judgment against APP, in the amount of $107,640,070.92, principal
plus interest accrued as of June 30, 2005, plus further interest
and costs, and against the PIOCs for $104,344,903.60 in principal
plus interest and further costs. APP asserts the affirmative
defenses of estoppel, waiver, ratification, laches, and
recoupment.  The PIOCs assert the affirmative defenses of
estoppel, waiver, ratification, laches, and recoupment, and
impossibility.

Jurisdiction

Ex-Im brings this case under the Federal Debt Collection
Procedures Act (FDCPA), 28 U.S.C. §§ 3001-3308 which provides
exclusive civil procedures for the United States to recover

2

judgment on a debt. Accordingly, jurisdiction in this court is based on 28 U.S.C. § 1345. Venue is established under 28 U.S.C. § 1391(b)(2) & (d).[2]

## Applicable Standard

The court will grant summary judgment only if Ex-Im can establish by undisputed facts, supported by admissible evidence, that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In making such a demonstration, as the moving party, Plaintiff has the burden of showing that no genuine factual dispute exists. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 (1970). When determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir.2004); see also LaFond v. Gen. Physics Serv. Corp., 50 F.3d 165, 171 (2d Cir.1995).

For questions of law, in accordance with the parties' loan agreements, New York law, applies.

## Facts

It is undisputed that APP, in its role as the parent of the

---

[2]The PIOCs have also asserted defenses of lack of personal jurisdiction and insufficient service of process. We reject these claims, however, because the PIOCs, like APP, agreed to jurisdiction in a valid forum-selection clause and because, as already established by Magistrate Judge Francis, the claim of insufficient service is without merit. Light Decl., Ex. D.

3

defendant subsidiaries, signed third-party guarantees for three
loans to the PIOCs made or guaranteed by Ex-Im.  It is similarly
undisputed that Tjiwi Kimia, Pindo Deli and Indah Kiat signed
valid promissory notes for the thirteen loans with Ex-Im. Nor is
it disputed that the PIOCs and APP have failed to repay these
loans leading to an outstanding debt totaling $107,640,070.97 in
principal and interest through June 30, 2005, for the loans
guaranteed by APP and $104,344,903.60 before interest, costs, and
other penalties for the loans to the PIOCs, inclusive of the
loans guaranteed by APP.[3]  It is also not disputed that the
original lenders, having been paid by Ex-Im after the default by
APP and the PIOCs, validly assigned each of the notes in question
along with the guarantees and related rights to Ex-Im.[4]

_____

[3]The outstanding amount on the loans made to the PIOCs,
exclusive of the amount guaranteed by APP, comes to
$12,445,202.48 before interest and costs.

[4]Relying on Rule 56(e) ("affidavit must be made on personal
knowledge..."), Defendants contend that Plaintiff's motion for
summary judgment as to the twelve loans for which Ex-Im served as
guarantor must fail because Ex-Im did not provide sufficient
evidence  that it paid out under its guarantees on these loans.
We reject this contention.  Ex-Im submitted admissible evidence,
in the form of a declaration by its Chief Financial Officer,
Michael Discenza, of payment by Ex-Im of the amount it guaranteed
on the twelve loans.  APP and the PIOCs contend that this
declaration does not suffice to meet the Rule's "personal
knowledge" requirement.  See Patterson v. County of Oneida, 375
F.3d 206, 219 (2d. Cir. 2004).  We find, however, that Discenza's
declaration meets this standard when considered in light of  his
position at Ex-Im.  "We are of [the] opinion that, ordinarily,
officers would have personal knowledge of the acts of their
corporations."  Catawba Indian Tribe v. South Carolina, 978 F.2d
(continued...)

4

### Discussion

Defendants' default is not at issue here.[5] What is at issue
here is whether Defendants' default is to be excused.  APP and
the PIOCs claim that one or more of their asserted defenses
prevent Ex-Im from enforcing payment of the otherwise valid debt.

I

We address first the provisions of the agreements in the
loans guaranteed by APP, and made to the PIOCS by several
lenders.  Ex-Im served as the lenders' guarantor for these loans.
Ex-Im claims that APP waived any possible defenses in the loan
contracts themselves, and that because of the force of the
provisions of APP's agreements, none of APP's claimed defenses

---

[4](...continued)
1334, 1342 (4th. Cir. 1992).  See also, Ondis v. Barrows, 538 F.
2d 904, 907, fn. 3 (1st. Cir. 1974).  (Holding that an officer
can be expected to have personal knowledge of the affairs of the
corporation.)  While these decisions are not binding on us we
find them persuasive here, especially as APP and the PIOCs have
not submitted any evidence that might raise even the slightest
doubt as to whether Ex-Im paid out on its guarantees.

[5]A prima facie case for payment upon default of a promissary
note under New York law requires that the party seeking payment
prove (1) the existence of a valid note, and (2) that the
defendant has failed to pay despite demand, unless demand has
been waived.  Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd.,
117 F. Supp. 2d 394, 399 (S.D.N.Y. 2000); Gateway State Bank v.
Shangri-La Private Club for Women, Inc., 113 A.D. 2d 791, 493
N.Y.S. 2d 306 (2d Dep't 1987).  As noted above, neither APP nor
the PIOCs contest the existence of their debts or that Ex-Im has
demanded payment on the debts that are now in default.

5

can prevail. As we will see, Ex-Im is correct because under New York law, and the facts of this case, APP's waiver settles the issue.

We pause to note, however, that Ex-Im offers arguments against each of the defenses asserted by APP, with regard to the debts guaranteed by APP. While we need deal only with the Ex-Im's contractual guarantee and waiver claim, because APP and the PIOCs assert the same litany of defenses, much of the analysis presented in Part II below would apply both to the PIOCs and to APP, i.e., the analysis below of the defenses asserted by the PIOCs would also apply to the assertion of the same defenses by APP. Nonetheless, because the loan guarantees signed by APP contain additional waivers of defenses and guarantees not found in the loan agreements signed by the PIOCs, we deal at the outset with APP. With regard to APP, we start and end our analysis with the loan guarantees made by APP, and APP's additional defenses need not be discussed.

Each of the loan agreements signed by APP contained absolute guarantees of payment and waivers of defenses. These guarantees and waivers of defenses state, in relevant part,

> FOR VALUE RECEIVED, the undersigned [APP], as primary obligor, hereby *unconditionally and irrevocably guarantees the full, prompt, and complete payment when due* (whether at scheduled maturity, by reason of acceleration or otherwise) of the principal of and interest on the foregoing promissory note, and hereby waives acceptance, diligence, presentment, demand, protest or notice of any kind whatsoever (including

6

notice of default or non-payment), as well as any
requirement that the holder exhaust any right or take
any action against the maker of the foregoing
promissory note, and hereby consents to any extension
of time or renewal or other modification thereof. *This
is a continuing, absolute and unconditional guarantee
of payment and not merely of collection.* To the
maximum extent permitted by applicable law, the
undersigned *hereby waives all defenses of a surety or
guarantor to which it might be entitled by statute or
otherwise.*
(Emphasis added)

Additional clauses contained in the various Credit

Agreements state:

No Waiver; Remedies Cumulative. No failure or delay on
the part of the Agent, any Lender or Eximbank in
exercising any right, power or privilege under this
Agreement or the Note(s) and no course of dealing
between or among the Borrower, the Guarantor, the
Agent, and Lender and/or Eximbank shall operate as a
waiver thereof...

Amendment or Waiver. This Agreement may not be
changed, discharged or terminated without the written
consent of the parties hereto, and no provision hereof
may be waived without the written consent of the party
to be bound thereby.

The Credit Agreements signed by APP for each of the loans

which it guaranteed further show the unconditional nature of the

guarantees in this case:

Guarantor Guarantee. The Guarantor hereby
*unconditionally and irrevocably guarantees* to the
Lender and Eximbank the full, prompt and complete
payment when due (whether at stated maturity, by
acceleration or other amounts payable by the Borrower
to the Lenders or Eximbank under this Agreement or the
Notes). If the Borrower shall fail to pay when due any
or all sums hereby guaranteed, (whether at stated
maturity, by acceleration or otherwise), the Guarantor
shall forthwith pay, without any demand or notice, the

7

full amount due and payable by the Borrower in U.S.
Dollars at the place and in the manner required by this
Agreement or Note(s).  This is a guarantee of payment
and not merely of collection, and shall remain in force
and effect until all obligations of the Borrower hereby
guaranteed are paid in full.  To the maximum extent
permitted by applicable law, the Guarantor *waives all
defenses of a surety or guarantor to which it may be
entitled by statute or otherwise.*
(Emphasis added)

While APP might claim that these guarantee provisions did

not exclude the assertion of all of its defenses, the

unconditional nature of the guarantees and the nature of the

waivers of defenses made by APP are most clearly illustrated by a

final clause:

Guarantee Continuing and Unconditional: (a) The
Guarantor Guarantee is a *continuing, absolute and
unconditional guarantee of payment* as a primary obligor
and not merely as surety, and shall apply to all
obligations of the Borrower under the Agreement and the
Note(s) whenever arising.  Without limiting the
generality of the foregoing, the Guarantor Guarantee
shall not be released, discharged or otherwise affected
by . . . (v) any insolvency, bankruptcy, reorganization
or other similar proceeding affecting the Borrower or
its assets; or (vi) *any other act or omission to act or
delay of any kind by the Borrower, the Guarantor, the
Lenders, the Agent or Eximbank or any other Person, or
any other circumstances whatsoever that might, but for
the provisions of this Section 3.02 constitute a legal
or equitable discharge or defense to the Guarantor's
obligations* hereunder.
(Emphasis added.)

Under New York law guarantees are usually acceptable in loan

contracts and a party may, in such a guarantee, waive the

defenses that she would otherwise have available.   In order for

a guarantee and a waiver of defenses in a loan contract to be

8

held valid the contract at issue must be between "sophisticated
parties" represented by council and the guarantees and waivers
must be "clear and unambiguous". <u>Ursa Minor Ltd. v. Aon Fin.
Pros.</u>,2000 U.S. Dist. LEXIS 10166 at *20. *See also* <u>Bank of New
York v. Tri Polyta Finance B.V.</u>, 2003 U.S. Dist. LEXIS 6981 at
*10-11. ("Under New York law, . . . unconditional guarantees
with clear and unambiguous terms are enforceable and bar the
assertion of affirmative defenses.") (Internal citation omitted.)
<u>Chemical Bank v. PIC Motors Corp.</u>, 452 N.Y.S. 2d 41 (upholding
unconditional guarantee of payment despite potentially negligent
or dishonest behavior of bank employees); <u>Marine Midland Bank v.
Walter Perlstein, Inc.</u>, 572 N.Y.S. 2d 789 (unconditional
guarantee upheld even in face of doubt about validity of
underlying instrument.)  These conditions apply here.  APP is a
major international corporation and was represented by counsel in
agreeing to the terms of the loan contracts.  The language of the
guarantees and waivers of defenses are clear and unambiguous, as
the multiple detailed clauses indicate.  Therefore, absent
sufficiently strong argument otherwise, we must accept that APP
has waived its affirmative defenses and therefore grant summary
judgment for Ex-Im.[6]

_____

[6]Defendants contend that a separate clause in the credit
agreements signed by APP as guarantor precludes waiver of
equitable defenses notwithstanding the statements otherwise in
the various guarantee clauses of the credit agreements.  We
                                                    (continued...)

9

APP disputes the claim that its guarantee and waiver of
defenses prohibit it from bringing the defenses of estoppel,
waiver, ratification, laches, and recoupment. APP cites case law
to support its position, arguing that these cases establish that,
notwithstanding APP's unconditional guarantee of payment and
waiver of all defenses, the company may still assert their
defenses in this case. The cases cited by APP, however, do not

_____

⁶(...continued)

reject this contention because the credit agreement clause upon
which the Defendants rely actually provides additional support
for the Plaintiffs' claims rather than limiting those claims in
the way that Defendants contend. The clause actually states, in
pertinent part, "[E]ach such Borrower Document which may
hereafter be executed and delivered will constitute, a direct,
general and unconditional obligation of the Guarantor which is
legal, valid and binding upon the Guarantor and enforceable
against the Guarantor in accordance with its respective terms,
except as such enforceability may be limited by... the
application of general principles of equity regardless of whether
such enforceability is considered in a proceeding at law or in
equity." Plaintiff's Exhibit E-1 at 44. This clause does not
operate to impose the limits suggested by Defendant for two
reasons. First, as a rule, general clauses such as this are
modified by the more specific clauses of the particular waivers
and guarantees signed by APP. See, William Higgins & Sons Inc.
v. State, 20 N.Y.2d. 425, 428 (N.Y. 1967)( "A specific provision
will not be set aside in favor of a catchall clause.").
Secondly, and relatedly, under the terms of the agreement as
written, as New York law generally allows waivers of defenses,
the "general principles of equity" require that we give effect to
the waivers, rather than expand the credit agreement clause to
eliminate the guarantees and waivers from the contract. To do
otherwise would be to fail to hold the parties to their written
agreement, and, rather, hold them to an agreement other than the
one which they have written and agreed to. Thus, with regard to
the claims at issue here, the correct interpretation of the
credit agreements clause is that it serves to support the
enforcement of the guarantees and waivers at issue.

10

support their conclusion.

The primary case cited by APP is Rose v. Spa Realty Assoc.,
42 N.Y. 2d 338.  This case supports the proposition that a party
to a contract may be equitably estopped from asserting a no oral
modification clause when, "a party to a written agreement has
induced another's significant and substantial reliance on an oral
modification."  Rose v. Spa Realty Assoc at 344.  Such estoppel
may only be applicable, however, when the  "conduct relied upon
to establish estoppel must not otherwise be compatible with the
agreement as written," id, i.e., the conduct asserted to provide
the basis for estoppel must be incompatible with the agreement.
To determine whether the rule of Rose is applicable, therefore,
we must consider APP's factual representations regarding the
basis for its estoppel claim.

In summary, APP claims that it would not have undertaken
some of the actions which it did undertake as part of an effort
to restructure its debts if Ex-Im's representative had not
suggested that APP do so.  Even if we accept these
representations as true, however, they are not sufficient to
ground an estoppel claim under the rule of Rose because
participation in any such negotiations on Ex-Im's part was
completely "compatible with the agreement [that is, the loan
agreement between Ex-Im and APP] as otherwise written." Rose at
345.  No facts asserted by the Defendants here suggest that the

11

negotiations produced a result that was incompatible with enforcement of the agreement.  Therefore, the rule of <u>Rose</u> is inapplicable to this case and does not support APP's estoppel claim.

Specifically, while Defendants claim that Ex-Im "induced" the Defendants to take certain actions, <u>see</u> infra, n.8, that constitute "modifications" to the loan agreements and that these "modifications" were agreed to because of Ex-Im's agent's representations that Ex-Im would approve the restructuring agreement, incompatibility is not present here because the conduct asserted to provide the basis for APP's estoppel claim is not incompatible with the loan agreements as written, i.e., none of the claimed modifications were of the character orally agreed to in <u>Rose</u>. In <u>Rose</u> the parties contracted for the deliver of 150 units and then orally modified this agreement so as to delivery only 96 units.  An agreement to deliver only 96 units is clearly incompatible with an agreement to deliver 150 units.  <u>Rose</u> at 345.  In the present case, however, none of the claimed "modifications" precluded compliance or performance with the loan agreements in any way, and none actually required any modification of those agreements. Therefore, none of the actions undertaken by APP as part of its negotiation process with Ex-Im were "incompatible" with the original loan agreements in any way comparable to the modifications agreed in <u>Rose</u>.

12

Furthermore, the facts of Rose are in several ways distinguishable from those in this case. Most importantly, unlike the loan contracts in this case, the real estate contract in Rose did not contain any clauses waiving affirmative defenses. Next, the oral modification in Rose had been "acted on to completion" and the seller in that case had "actively lulled the purchaser into thinking the oral modification *had been* accepted" (emphasis added). While APP claims to have been induced to believe that the proposed re-structuring of its agreements had been accepted, there is, in the present case, no assertion of a comparable "action to completion" because any action undertaken by APP was, at most, preparatory for the repayment of already existing loans.

The other cases that APP cites in support of its estoppel defense also do not support its claims. Indemnity Insurance Co v. Levin, 563 N.Y.S. 2d 811 relies on Rose and does not significantly alter the above analysis. The contract at issue in Indemnity, like that in Rose, lacked a clause waiving affirmative defenses. Similarly, in Indemnity, once again, we find a party who fully performed on an oral modification clearly accepted by both parties, Indemnity, at 813-4, a fact not found in the present case.

Nassau Trust Co. v. Montrose Concrete Products Corp., 56 N.Y. 2d 175 differs from the present case in that in Nassau the

13

bank in question did not just engage in negotiations about restructuring a debt but rather granted an extension and then withdrew it without notice. While Ex-Im's representative may have engaged in negotiations with APP about restructuring APP's debt, there is nothing on which to base the inference that Ex-Im finalized any changes to the agreements. The cases are therefore distinct.[7] Furthermore, the loan contract in Nassau once again did not contain a waiver of defenses clause like that found in the loans signed by APP.

Canterbury Realty and Equipment Corp. v. Poughkeepsie Savings Bank, 524 N.Y.S. 2d 531, also does not support APP's estoppel defense. In Canterbury the New York State Appellate Division held that an unconditional guarantee of payment by the debtor party was limited by the bank's obligation to perform under the terms of the contract in question. Id. at 534.

---

[7]Defendants contend that statements made by Ex-Im representative Charles Leik during the negotiation process, to the effect that if APP followed Ex-Im's demands then it would not sue, have the same effect as the extension granted by the bank in Nassau Trust. This is incorrect. Not only does Plaintiff claim that Leik, unlike the bank vice-president in Nassau Trust, lacked real or apparent authority to make such a guarantee, but, more importantly, at least for summary judgment purposes, the situation here and in Nassau Trust are fundamentally different. In Nassau Trust the claim relied upon by the defendants was a fundamental change to the existing underlying agreement, one incompatible with the original agreement's time limit and "no oral modification" clause. Nassau Trust at 179. But, as noted before, any statements made by Leik were, at most, preparatory to an eventual modification and not incompatible with the underlying agreement between Defendants and Ex-Im.

14

Additionally, the bank in <u>Canterbury</u> engaged in affirmative
wrongful conduct that directly led to the default by the debtor
party. <u>Id.</u> at 534-5. Neither factor is present in the instant
case. Here Ex-Im seeks to enforce APP's original agreement and
there is no claim that Ex-Im did not itself perform its
obligations under the loan contract with APP. Moreover, there is
no evidence or possible inference that Ex-Im was in any way
responsible for APP's default on its loans. Therefore,
<u>Canterbury</u> is distinguishable from the present case and cannot
support APP's estoppel defense. Given this, we must hold that
APP has waived any affirmative defenses that it otherwise might
have been able to assert against Ex-Im.

II

As noted above, Ex-Im also moves for summary judgment,
against the PIOCs, for default on loans totally $104,344,903.60
in principal plus interest and further costs. In opposition to
Ex-Im's motion, the PIOCs assert the same litany of affirmative
defenses raised by APP: estoppel, waiver, ratification, laches,
and recoupment. However, because the loan agreements signed by
the PIOCs did not contain the unconditional guarantees and
waivers of defenses contained in the loan guarantees signed by
APP, we must here look at the evidence presented in support of
these claims to determine whether that evidence, and any
reasonable inferences, could provide a basis for a legally

15

sufficient defense.[8]   In order to survive a motion for summary

judgment, the non-movant must invoke more than just "metaphysical

doubt as to the material facts." Rather, the non-moving party

must offer sufficient evidence to enable a reasonable finder of

fact to return a verdict in its favor. Bradely v. City of New

York, 2007 U.S. District Lexis 7811, *5-*6 (S.D.N.Y. 2007.)

(Internal citation omitted.)   See also, Scotto v. Almenas, 143

F.3d 105, 114 (2d Cir. 1998.)

    The most substantial defense offered by the PIOCs is

equitable estoppel.  The PIOCs contend, like APP, that Ex-Im,

because it took part in a series of negotiations to re-structure

their debt and because Defendants undertook certain actions that

they might not have otherwise undertaken,[9] ought to be estopped

from suing the PIOCs on their outstanding debt.  Under normal

circumstances, for a party to prevail on an estoppel defense it

must show that, (1) it relied on the opposing party's conduct,

(2) this reliance caused it injury or detriment, and (3) this

reliance was "reasonable in that [it] did not know or should have

known that its adversary's conduct was misleading."   In re

_____

    [8]Recall that this analysis would apply as well to the merits
of these defenses when asserted by APP, though we did not need to
reach this issue.

    [9]This point is, of course, contestable because the actions
which Ex-Im allegedly "induced" were all payments or steps
towards payment of debts by APP and the PIOCs on obligations
which were otherwise valid, that is, that the Defendants had
existing obligations to pay.

16

Becker, 407 F.3d 89, 99 (2d Cir. 2005).  However, when a
government agency is involved, a higher standard is applied,
Becker, at 99, requiring the party asserting estoppel to show not
only the three elements listed above but also that the government
agency in question engaged in "affirmative misconduct".  Drozd v.
INS, 155 F.3d 81, 90 (2nd Cir. 1998).

It is not disputable that Ex-Im was, in the transactions in
question, acting as a government agency.  12 U.S.C. § 635(a)(1)
establishes Ex-Im as, "[A]n agency of the United States of
America" working to "[maintain] and contribute to the employment
of U.S. workers" by "facilitat[ing] the export of goods and
services" from the United States.  12 U.S.C. § 635(a)(1).  That
Ex-Im acts as a governmental and not a private agency is further
indicated by the legal requirement that it, in its actions, must,
"supplement and encourage, and not compete with, private capital"
and must take care that its actions do not adversely effect U.S.
industry.  12 U.S.C. § 635(b)(1)(B).  These factors establish
that Ex-Im is a governmental agency and acts, when providing
loans and loan guarantees, in a governmental and not a commercial
manner.  Ex-Im is, therefore, eligible for the higher standard
needed to establish an estoppel defense granted to government
agencies.[10]

_____

[10]Defendants make an argument we must briefly address here,
specifically, that, "this Court has ruled already that the normal
(continued...)

17

Because affirmative misconduct is a higher standard than is
needed to establish a defense of estoppel in normal
circumstances, the government may be estopped "only in very
limited and unusual circumstances." U.S. v. Boccanfuso, 882 F.2d
666, 670 (2nd Cir. 1989). The PIOCs have not provided evidence
that could establish "affirmative misconduct" on the part of Ex-
Im.  Even assuming that the defendants' account of the
negotiations between APP and the PIOCs on the one hand, and Ex-Im
on the other, is completely true, the defendants have not
presented any evidence upon which a reasonable fact-finder could
conclude that Ex-Im engaged in "affirmative misconduct".  This is
especially so because each action that Ex-Im "induced" (here

---

[10](...continued)
rules of estoppel [excluding the governmental misconduct
standard] apply in this case" as a result of Judge Swain's
decision refusing to grant discovery into Ex-Im's internal
deliberations.  Defendant's Memorandum of Law at 23.  Defendants
are not correct.  This Court has at no time ruled that the
"normal rules of estoppel apply" in this case.  On the contrary,
Judge Swain's decision of March 14, 2006 indicates the opposite.
In that decision, Judge Swain upheld all of the orders of
Magistrate Judge Francis specified in his Memorandum and Order
dated November 8, 2005. Magistrate Judge Francis, in that Order,
explicitly held that the higher "affirmative misconduct" standard
of estoppel appropriate for claims against the federal government
applied in this case.  Memorandum and Order of Magistrate Judge
Francis dated November 8, 2005 at 9.  Furthermore, Magistrate
Judge Francis held that this finding rendered Defendants'
estoppel claim "futile" because Defendants could not hope to show
government misconduct, and that therefore further discovery was
not appropriate.  Id.  at 8.  Because this order was upheld in
its entirety by Judge Swain, Defendants are, at best, completely
mistaken in their claim.

assuming this is the proper term) the Defendants to undertake was an action which the Defendants already had legal obligations to undertake.[11] It is completely unclear how such "inducement" could amount to "affirmative misconduct".

In an earlier hearing relating to this same subject matter Magistrate Judge Francis correctly noted that the sort of behavior allegedly undertaken by Ex-Im, i.e., aggressive negotiations in the service of recovering money owed to it, including extracting concessions from the debtors, "is hardly egregious." (Light Supp. Decl. Ex.L, at 9). See also United States v. Wallace & Wallace Fuel Oil Co., 540 F. Supp. 419, 431 (S.D.N.Y. 1982) (holding that an estoppel defense is not established when one party attempts, via negotiation, to procure money owed to it without resorting to litigation and then later sues to recover the money after negotiations break down.) Because the PIOCs have not presented evidence which could demonstrate that Ex-Im engaged in behavior amounting to "affirmative misconduct" during the negotiations to restructure

---

[11]Examples of actions taken by the PIOCs and APP that they contend they would not have undertaken without "inducement" from Ex-Im include making a payment of $90,000,000.00 to the Indonesian Bank Restructuring Agency (IBRA) and placing several hundreds of millions of dollars into escrow. Defendants' Memorandum of Law 8-13. However, the money paid to IBRA by Defendants was for an existing debt and cannot therefore be considered a detriment. The requiring of funds to be paid into escrow appears to be a legitimate measure undertaken to ensure that creditors were paid. In any case, neither action rises to the level of "affirmative misconduct".

APP's and the PIOC's debt, they cannot establish the defense of equitable estoppel. [12]

Finally on the matter of estoppel, based on their submission here, the PIOCs could not establish an estoppel claim, even on the non-governmental standard, because, as noted above, an estoppel claim requires that the "conduct relied upon [by the party seeking to establish estoppel] must not otherwise be compatible with the agreement as written." Rose, 42 N.Y. 2d at 344. Here, because the alleged negotiations undertaken by Ex-Im were not in any way incompatible with the "agreement as written", there can be no basis for an estoppel defense. In light of these considerations the court must, as a matter of law, reject the PIOCs affirmative defense of equitable estoppel.

In addition to equitable estoppel the PIOCs assert affirmative defenses of ratification, laches, and recoupment. The PIOCs have, however, fail to offer any evidence that could ground such defenses. Ratification requires, "the express or implied adoption of the acts of another by one for whom the other

---

[12]Because the PIOCs have not presented evidence that could meet the higher burden required to assert a defense of estoppel against a government agency, we need not explicitly discuss Ex-Im's claims, asserted in reply to PIOC's estoppel claim, that the estoppel defense is also blocked because, first, public funds appropriated from the treasury are here at issue, and secondly that Ex-Im (as a government agency) could only be estopped by statements made by someone with actual authority to bind the government, something claimed by Ex-Im not to exist in this case.

assumes to be acting, but without authority." Holm v. C.M.P.
Sheet Metal, Inc., 455 N.Y.S. 2d 429, 432 (4th Dep't 1982). See
also, 21 NY Jur, Estoppel, Ratification, and Waivers, § 85.  In
this case, therefore, ratification would require that Ex-Im's
management adopt any agreements supposedly made by the
participants in the re-settlement negotiations.  Neither APP nor
the PIOCs have presented any evidence that such ratification took
place or could reasonably be inferred.  This defense, therefore,
cannot stand.

Laches, or unreasonable delay, is also not available to the
PIOCs as a defense here.  For laches to be available against the
government, the party asserting the defense must show that, at a
minimum, the suit was filed outside of the statute of
limitations.  U.S. v. Milstein, 401 F.3d 53, 63 (2d Cir. 2005).
This is not the case here, and neither APP nor the PIOCs have
presented any evidence to the contrary.

Finally, recoupment is a "deduction from a money claim
through a process whereby cross demands arising out of the same
transaction are allowed to compensate one another and the balance
only to be recovered." New York State Elec. & Gas Co. v.
McMahon, 129 F.3d 93, 96 (2d Cir. 1997).  We here note that
recoupment is more properly a counter-claim rather than an
equitable defense.  Even broadly construed, Defendants claims
could not be asserted to establish a counter-claim that could

21

affect the net liability of the parties and that arises out of
the same transactions as the asserted claim.   Therefore, this
defense cannot be maintained.

### Conclusion

The record here conclusively establishes that Ex-Im made or
guaranteed a number of loans to the PIOCs, several of which were
in turn guaranteed by APP.   These loans are now all in default.
These facts are undisputed facts and there is insufficient
evidence to raise a material question of fact with regard to any
special circumstances or legally sufficient affirmative defense.
Because neither APP nor the PIOCs can establish the grounds
needed for their various affirmative defenses, summary judgment
for Ex-Im is therefore appropriate.

Judgment will therefore be entered for Ex-Im against APP for
the amount of $107,640,070.92 plus additional interest and costs,
against PT Indah Kiat Pulp and Paper TBK for $52,438,001.60 plus
interest and costs, against PT Pabrik Kertas Tjiwi Kimia TBK for
$48,148,935.32 plus interest and costs, and against PT Pindo Deli
Pulp and Paper Mills for $3,757,966.73 plus interest and costs.

The parties are directed to confer and prepare a draft
judgment in accordance with this opinion. A draft judgment should
be submitted by March 6, 2008.  If the parties are unable to
agree on an appropriate judgment, each party shall submit its

22

proposed draft judgment by the date specified.

It is SO ORDERED.

Donald C. Pogue, Judge

Dated:     February 6, 2008
           New York, New York

23

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

EXPORT-IMPORT BANK OF
THE UNITED STATES,

                    Plaintiff,

            -against-

ASIA PULP & PAPER CO., LTD.,
PT INDAH KIAT PULP & PAPER TBK,
PT PABRIK KERTAS TJIWI KIMIA TBK,
AND PT PINDO DELI PULP & PAPER
MILLS,

                    Defendants.

-----------------------------------------------------------x

MAY 2 9 2008

S. D. OF N.Y.

**SCANNED**

03 Civ. 8554 (DCP) (JCF)

**JUDGMENT**

No. _08 0923_

        This action for breach of contract, breach of promissory notes and breach of guarantee

having come before the Honorable Donald C. Pogue, United States District Judge[1], and the

issues having been duly considered and a decision having been duly rendered in an Opinion and

Order dated February 6, 2008; and

        The Court having found in favor of the plaintiff, the Export-Import Bank of the United

States of America, and against the defendants on the plaintiff's claims for breach of contract,

breach of promissory notes and breach of guarantee; and

        The parties having resolved any dispute regarding the amount of costs, expenses and

attorneys' fees that are due or allowable to date pursuant to the contracts, notes and guarantees at

---

[1]      Judge Donald C. Pogue of the United States Court of International Trade, sitting by
designation.

issue, and/or pursuant to Rule 54 of the Federal Rules of Civil Procedure and Local Civil Rule
54.1 (collectively the "Federal Rules"); it is

ORDERED, ADJUDGED AND DECREED: That the plaintiff is awarded judgment in
the total amount of $144,201,884.96, including interest calculated as of May 22, 2008, plus post-
judgment interest pursuant to 28 U.S.C. § 1961, for which the defendants are liable in the
specific amounts set forth herein as follows; and it is further

ORDERED, ADJUDGED AND DECREED: That the plaintiff is awarded judgment in
the sum of $125,145,501.33, including interest calculated as of May 22, 2008, as against the
defendant Asia Pulp & Paper Company, Limited, plus post-judgment interest pursuant to 28
U.S.C. § 1961, jointly and severally with the judgments against P.T. Indah Kiat Pulp and Paper
TBK, PT Pabrik Kertas Tjiwi Kimia TBK, and PT Pindo Deli Pulp and Paper Mills as indicated
below, and that plaintiff have execution therefor; and it is further

ORDERED, ADJUDGED AND DECREED: That the plaintiff is awarded judgment in
the sum of $73,402,063.10, including interest calculated as of May 22, 2008, as against the
defendant P.T. Indah Kiat Pulp and Paper TBK, for which Asia Pulp & Paper Co. Ltd. is jointly
and severally liable in the amount of $58,267,932.51, plus post-judgment interest pursuant to 28
U.S.C. § 1961, and that plaintiff have execution therefor; and it is further

ORDERED, ADJUDGED AND DECREED: That the plaintiff is awarded judgment in
the sum of $65,510,977.23, including interest calculated as of May 22, 2008, as against the
defendant PT Pabrik Kertas Tjiwi Kimia TBK, for which Asia Pulp & Paper Co. Ltd. is jointly
and severally liable in the amount of $61,588,724.22, plus post-judgment interest pursuant to 28
U.S.C. § 1961, and that plaintiff have execution therefor; and it is further

**ORDERED, ADJUDGED AND DECREED:** That the plaintiff is awarded judgment in the sum of $5,288,844.60, including interest calculated as of May 22, 2008, as against the defendant PT Pindo Deli Pulp and Paper Mills, for which Asia Pulp & Paper Co. Ltd. is jointly and severally liable in the amount of $5,288,844.60, plus post-judgment interest pursuant to 28 U.S.C. § 1961, and that plaintiff have execution therefor; and it is further

**ORDERED, ADJUDGED AND DECREED:** That the plaintiff is awarded judgment for plaintiff's costs, expenses and attorneys' fees that are due or allowable to date pursuant to the contracts, notes and guarantees at issue and/or pursuant to the Federal Rules, in the total amount of $1,900,000.00, for which the defendants are liable in the specific amounts set forth herein as follows; and it is further

**ORDERED, ADJUDGED AND DECREED:** That the plaintiff is awarded judgment for plaintiff's costs, expenses and attorneys' fees that are due or allowable to date pursuant to the contracts, notes and guarantees at issue and/or pursuant to the Federal Rules, as against the defendant Asia Pulp & Paper Co. Ltd. in the amount of $1,672,000.00, jointly and severally with the judgments against P.T. Indah Kiat Pulp and Paper TBK, PT Pabrik Kertas Tjiwi Kimia TBK, and PT Pindo Deli Pulp and Paper Mills as indicated below; and it is further

**ORDERED, ADJUDGED AND DECREED:** That the plaintiff is awarded judgment for plaintiff's costs, expenses and attorneys' fees that are due or allowable to date pursuant to the contracts, notes and guarantees at issue and/or pursuant to the Federal Rules, as against the remaining defendants as follows: $950,000.00 as against the defendant P.T. Indah Kiat Pulp and Paper TBK; $874,000.00 as against the defendant PT Pabrik Kertas Tjiwi Kimia TBK; and $76,000.00 as against the defendant PT Pindo Deli Pulp and Paper Mills; and it is further

**ORDERED, ADJUDGED AND DECREED:** That nothing in this judgment precludes plaintiff from seeking post-judgment costs, surcharges, expenses and attorneys' fees pursuant to the contracts, notes and guarantees at issue and/or pursuant to other applicable law, and that nothing in this judgment precludes the defendants from raising any defense against an application or request for such relief; and it is further

**ORDERED, ADJUDGED AND DECREED:** That this judgment is a final judgment pursuant to Fed. R. Civ. P. 58.

Dated: New York, New York
_____, 2008

S. Michael McMahon
**Clerk of Court**

So Ordered:

_____
Honorable Donald C. Pogue
United States District Judge

By:

_____
**Deputy Clerk**

**THIS DOCUMENT WAS ENTERED**
**ON THE DOCKET ON** _____

# EXHIBIT 3

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York,
By: SARAH E. LIGHT
Assistant United States Attorney
86 Chambers Street
New York, New York  10007
Telephone No.: (212) 637-2774
Fax No.: (212) 637-2686
sarah.light@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

EXPORT-IMPORT BANK OF THE
UNITED STATES,

                Plaintiff and
                Judgment Creditor,

      -v.-

PT PINDO DELI PULP AND PAPER MILLS,

                Defendant and
                Judgment Debtor,
        and

CELLYNNE HOLDINGS, INC.

                Garnishee.

------------------------------------x

**WRIT OF GARNISHMENT**

03 Civ. 8554 (DCP) (JCF)

Judgment No. 08,0923

GREETINGS TO:    Cellynne Holdings, Inc.
                   c/o March Allegre, Registered Agent
                   1006 Marley Drive
                   Haines City, FL 33844

                   Cellynne Holdings, Inc.
                   1006 Marley Drive
                   Haines City, FL 33844
                   Attention: Legal Department

        An application for a Writ of Garnishment against the property of defendant PT Pindo

Deli Pulp and Paper Mills (the "defendant" or the "debtor"), whose last known address is PT Pindo

Deli Pulp and Paper Mills, Plaza BII, Tower II, 7th Floor, Jalan M.L. Thamrin No. 51, Jakarta

10350, Republic of Indonesia, has been filed with this court. On May 29, 2008, judgment was awarded against the debtor, arising from defendant's breach of a promissory note and breach of contract, for failure to repay a loan guaranteed by the Export-Import Bank of the United States, in the amount of $5,288,844.60, plus $76,000 in costs, expenses and attorneys' fees, calculated as of May 22, 2008, plus post-judgment interest as provided by 28 U.S.C. § 1961. ~~In addition, pursuant to the FDCPA, the Court has included in the relief the statutory 10 percent surcharge, pursuant to 28 U.S.C. § 3011, to cover Ex-Im's costs of enforcement of its claim for Pindo Deli's debt. That surcharge totals $540,109.33.~~

The balance due on the debt as of September 23, 2008, ~~including the 10 percent surcharge,~~ is ~~$5,941,202.64~~ *5,403,550.55*.

You are required by law to withhold and retain any property in which the debtor has a substantial nonexempt interest and for which you have or may become indebted to the debtor pending further order of the court. You are required by law to file a written answer, under oath, within ten (10) days of service of this writ stating whether or not you have in your custody, control or possession, any property owned by the debtor, including nonexempt, disposable earnings. Please state whether or not you anticipate making any future payments to the debtor and whether such payments will likely be weekly, bi-weekly or monthly.

You must file the original answer to this writ with the Clerk of the United States District Court, Southern District of New York, United States Courthouse, 500 Pearl Street, New York, New York 10007. Additionally, you are required to serve a copy of the answer upon the debtor PT Pindo Deli Pulp and Paper Mills, Plaza BII, Tower II, 7th Floor, Jalan M.L. Thamrin No. 51, Jakarta 10350, Republic of Indonesia, c/o its counsel, Kenneth Puhala, Schnader Harrison Segal and Lewis, LLP, 140 Broadway, Suite 3100, New York, NY 10005, and upon the United States Attorney's Office, Southern District of New York, 86 Chambers Street, New York, New York, 10007, Attention: Sarah E. Light, Assistant United States Attorney.




There may be property which is exempt by law from this writ of garnishment. Property which is exempt and which is not subject to this writ is listed on the annexed Notice from the Clerk of the United States District Court.

If you fail to answer this writ or withhold property in accordance therewith, the United States of America may petition the court for an order directing you to appear before the court to show good cause why you failed to comply with this writ. If you fail to appear or do appear and fail to show good cause why you failed to comply with the writ, the court shall enter a judgment against you for the value of the debtor's nonexempt interest in the property.

It is unlawful to pay or deliver to the debtor any items attached by this writ.

Dated: New York, New York
_____, 2008

So Ordered:

_____
UNITED STATES DISTRICT JUDGE